IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KRISTY L. THOMPSON, ) | |
| ) | |
| Petitioner ) | |
| ) | |
| vs. ) | Case No. CIV-04-707-F |
| ) | |
| MILLICENT NEWTON-EMBRY, ) | |
| ) | |
| Respondent. ) | |

**REPORT AND RECOMMENDATION**

Petitioner, a state prisoner appearing pro se, brings this action pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus. Pursuant to an order of United States District Judge Stephen P. Friot, the matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Petitioner has amended her petition, and a response to the amended petition has been filed. Thus, the matter is at issue and ready for disposition. For the reasons set forth below, the undersigned recommends that the amended petition be denied.

By this action, Petitioner challenges her convictions by a jury on February 7, 2002, for the crimes of robbery with a weapon and conspiracy. Case No. CF-2001-293, District Court of Stephens County.  Petitioner was sentenced to ten years imprisonment on the robbery count, and to two years on the conspiracy count, to run consecutively.  Petitioner then filed a direct appeal, and the Oklahoma Court of Criminal Appeals affirmed[1] on February 28, 2003. See Summary Opinion, Case No. F-2002-203, Oklahoma Court of

---

[1]The Oklahoma Court of Criminal Appeals reversed Petitioner's conviction for assault and battery with a weapon with instructions to dismiss, finding that her convictions for both robbery with a weapon and assault and battery with a weapon violated Oklahoma's statute providing that where one act violates two criminal provisions, the act cannot be punished twice, absent specific legislative intent. Summary Opinion, p. 2 (attached to Response to Amended Petition, Ex. 3).

Criminal Appeals (attached to brief in support of petition). Petitioner did not seek any post-conviction relief in the state courts. Petition, p. 2.

## I. PROCEDURAL HISTORY

Respondent filed a motion to dismiss Petitioner's original petition as time-barred under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[2] [Doc. No. 16]. After reviewing Petitioner's response to that motion, as well as Respondent's reply, the undersigned gave notice of intent to convert the motion to dismiss to a motion for summary judgment. [Doc. No. 22]. After reviewing additional materials and briefs submitted by the parties following conversion of the motion, the undersigned recommended that the motion for summary judgment on the basis of the AEDPA limitations period be denied. [Doc. No. 31]. That Report and Recommendation was adopted by Judge Friot on December 17, 2004, and the matter was re-referred to the undersigned. [Doc. No. 33].

Thereafter, Respondent filed another motion to dismiss, this time on the basis that Petitioner had failed to exhaust her available state court remedies with regard to all of the claims raised in the original petition. [Doc. No. 34]. The undersigned agreed that some of Petitioner's claims were not exhausted, and recommended dismissal of the petition without prejudice unless Petitioner amended her petition to present only exhausted claims. [Doc. No. 37]. Petitioner responded to the Report and Recommendation indicating her intent to amend her petition to contain only exhausted claims, and also filed an "Amended Brief in Support of Petition for Writ of Habeas Corpus." [Doc. Nos. 38, 39].

---

[2]Pub. L. No. 104-132, 110 Stat. 1214, effective April 24, 1996.

Judge Friot adopted the undersigned's Report and Recommendation, construed Petitioner's "Amended Brief" as an amended petition, struck Respondent's motion to dismiss as moot, and re-referred the case to the undersigned for further proceedings. [Doc. No. 40]. As noted above, Respondent has now filed a response to the amended petition.

## II.  FACTUAL BACKGROUND

Around midnight on September 7, 2001, Petitioner and Kenneth Thompson (Petitioner's husband and co-defendant in the case that resulted in her convictions) went to the jail in Marlow, Oklahoma, to post bond for a friend who was being held there. They were told that they were about $20 short of the money needed for the bond. They whispered something to their friend, told the officer there that they would be back, and left.

About 1½ to 2 hours later, Eloy Dan Leija was asleep in his room at the Hillcrest Motel in Duncan, Oklahoma, when he was awakened by a knock on his door. When he opened the door, Petitioner was there stating that she needed help. When Mr. Leija asked her what kind of help she needed, she stated that she would go get her friend. In the time it took Mr. Leija to close his door and slip on some jogging pants, there was another knock. This time when he opened the door, Petitioner was standing there with Kenneth Thompson. Mr. Thompson struck Mr. Leija in the forehead with a steel tire tool, and Mr. Leija began to fight Mr. Thompson. After a short struggle, Petitioner and Mr. Thompson ran away. Pants that had been hanging on a chair near the door of Mr. Leija's room were found in the motel parking lot, and a wallet containing $180 that had been in the pants

was missing. Shortly after the robbery of Mr. Leija, Petitioner and Mr. Thompson returned to the Marlow jail with enough money to post their friend's bond.

**III. STANDARD GOVERNING PETITIONS FOR HABEAS CORPUS**

For factual and legal issues that have already been adjudicated in state court, the Court may only grant a writ of habeas corpus if that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1) and (2).

A state court's determination is contrary to clearly established federal law where it applies a rule that contradicts the law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court's determination involves an unreasonable application of clearly established Supreme Court precedent if it identifies the correct governing legal principle from the Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Id. at 413; see also Wiggins v. Smith, 539 U.S. 510, 520 (2003). It is not enough that the state court applied clearly established federal law erroneously or incorrectly; the application must also be unreasonable. Williams, 529 U.S. at 410-11; Valdez v. Bravo, 373 F.3d 1093, 1096 (10th Cir.), cert. denied, 125 S.Ct. 622 (2004).

## IV. DISCUSSION

Petitioner raises three grounds for relief in her amended petition. In ground one, Petitioner alleges that there was insufficient evidence to support her convictions. In her second ground for relief, Petitioner claims that an evidentiary harpoon and subsequent prosecutorial misconduct deprived her of a fair trial. In her final ground, Petitioner claims her right to a fair trial was denied by virtue of the cumulative effect of trial errors.

### A. Sufficiency of the Evidence

In ground one, Petitioner claims that the State failed to present sufficient evidence to support her convictions for robbery with a weapon and conspiracy. Rejecting this claim on direct appeal, the Oklahoma Court of Criminal Appeals found "the circumstantial evidence sufficient to support [Petitioner's] conviction for Robbery with a Weapon" and that "sufficient circumstantial evidence was presented upon which to base a finding that an agreement did exist between [Petitioner] and her co-defendant thereby supporting a conviction for conspiracy." Summary Opinion, p. 2-3.

In reviewing the sufficiency of the evidence for purposes of habeas corpus relief, clearly established Supreme Court precedent provides that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Romano v. Gibson, 239 F.3d 1156, 1164 (10th Cir. 2001). In applying this standard, the reviewing court may not weigh conflicting evidence or consider the credibility of witnesses. Grubbs v. Hannigan,

982 F.2d 1483, 1487 (10th Cir. 1993). Rather, the court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." Id.

An even more limited review is required by 28 U.S.C. § 2254(d) where, as here, a habeas petitioner's sufficiency of the evidence challenge has already been decided on the merits in state court. Valdez v. Ward, 219 F.3d 1222, 1237 (10th Cir. 2000). Pursuant to § 2254(d), Petitioner is not entitled to relief unless the Oklahoma Court of Criminal Appeals' determination that there was sufficient evidence was unreasonable. Torres v. Mullin, 317 F.3d 1145, 1151 (10th Cir.), cert. denied, 540 U.S. 1035 (2003). "That amounts to deference squared." Torres v. Lytle, No. 03-2098, 2004 WL 103557 at *2 (10th Cir. Jan. 23, 2004).[3]

In determining whether the Oklahoma Court of Criminal Appeals was reasonable in finding the evidence sufficient to support Petitioner's convictions, the Court must start with Oklahoma law defining the substantive elements of the crime. Jackson, 443 U.S. at 324 n.16. The essential elements of the crime of robbery with a weapon, as set forth in Oklahoma's uniform jury instructions, are as follows:

ROBBERY WITH A DANGEROUS WEAPON - ELEMENTS

No person may be convicted of robbery with a dangerous weapon unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

First, wrongful;

Second, taking;

Third, carrying away;

---

[3]This and any other unpublished decisions are cited solely for their persuasive value in accordance with Tenth Circuit Rule 36.3.

>Fourth, personal property;
>
>Fifth, of another;
>
>Sixth, from the person/(the immediate presence) of another;
>
>Seventh, by force/fear;
>
>Eighth, through use of a (loaded/unloaded firearm)/(blank/ imitation firearm capable of raising in the mind of the person threatened with such device a fear that it is a real firearm)/(dangerous weapon).

Oklahoma Uniform Jury Instructions - Criminal (OUJI-CR) 4-144. Oklahoma law also provides that all persons concerned in the commission of a crime are considered to be principals:

>AIDING AND ABETTING - INTRODUCTION
>
>All persons concerned in the commission of a crime are regarded by the law as principals and are equally guilty thereof. A person concerned in the commission of a crime as a principal is one who (directly and actively commits the act(s) constituting the offense)/(knowingly and with criminal intent aids and abets in the commission of the offense)/(whether present or not, advises and encourages the commission of the offense).

OUJI-CR 2-5. The essential elements of the crime of conspiracy are as follows:

>CONSPIRACY - ELEMENTS
>
>The elements of conspiracy are as follows:
>
>First, an agreement by two or more persons,
>
>Second, to commit [Crime or Conduct Charged],
>
>Third, the defendant(s) (was/were [a] party(ies) to the agreement at the time it was made)/(knowingly became [a] party(ies) to the agreement at some time after it was made),
>
>Fourth, an overt act by one or more of the parties performed subsequent to the formation of the agreement.

OUJI-CR 2-17.

Taken in the light most favorable to the prosecution, the following facts were established at trial. Antonio Aguilera, an officer with the City of Marlow Police Department, testified that two people he identified as the Petitioner and Kenneth Thompson[4] came to the Marlow jail around midnight on September 7, 2001, to attempt to post bond for a friend of theirs. Tr. p. 69, l. 4-10; p. 70, l. 6-14; p. 71, l. 6-23. They were twenty dollars or less short of the amount of money needed to post the bond, and were told they could not bond their friend out without the total amount. Tr. p. 70, l. 14-20; p. 72, l. 3-7. Petitioner and her co-defendant were allowed thirty seconds to one minute to speak to their incarcerated friend, and were observed whispering something in his ear. Tr. p. 70, l. 21-24; p. 72, l. 13-19. Petitioner and her co-defendant then told Officer Aguilera that they would be back shortly with the rest of the money to bond out their friend, and left. Tr. p. 72, l. 16-18. About two hours later, the Marlow police department dispatcher heard on his police scanner that two people matching the description of the people who had just attempted to bond out their friend had been involved in an assault in Duncan. Tr. p. 72, l. 20-25; p. 73, l. 23-25; p. 74, l. 1-5. The Hillcrest Motel in Duncan is about fifteen minutes from the jail in Marlow. Tr. p. 66, l. 12-17. Hearing of this, Officer Aguilera contacted the Duncan police department to let them know that two people matching the description had been to the Marlow jail that night. Tr. p. 74, l. 6-15. Less than an hour later, Petitioner and her co-defendant returned

---

[4]Petitioner's husband, Kenneth Thompson will be referred to as co-defendant hereinafter.

to the Marlow jail stating that they now had the money they needed to bond out their friend.  Tr. p. 74, l. 16-25; p. 75, l. 1-3.

Eloy Dan Leija was asleep in his room at the Hillcrest Motel in Duncan, Oklahoma, on September 7, 2001, when he heard a knock on the door around 1:30 or 2:00 a.m..  Tr. p. 86, l. 24-25; p. 87, l. 14-25; p. 88, l. 1-9; p. 102, l. 12-13. When he opened the door, a woman he later identified as the Petitioner was there stating that she needed help.  Tr. p. 88, l. 10-24; p. 89, l. 1-2, 10-13. Mr. Leija asked her what kind of help she needed, and she stated that she would go get her friend and be right back.  Tr. p. 89, l. 16-18.  Mr. Leija had just closed the door so that he could put on some jogging pants when he heard another knock on the door.  Tr. p. 89, l. 20-25. This time when he opened the door, Petitioner and a man he later identified as her co-defendant were standing at the door.  Tr. p. 89, l. 23-25; p. 90, l. 19-22. The man struck Mr. Leija in the forehead with a steel "car tool," and the two men began to scuffle.  Tr. p. 90, l. 23-25; p. 91, l. 1-21.  While Mr. Leija and the man were fighting, he heard the man yell "Run, Babe.  Run, Babe. Run, Babe." Tr. p. 91, l. 22-25. Mr. Leija got up and ran to the motel office, and the man and woman ran to their car and took off at a high rate of speed. Tr. p. 92, l. 17-22; p. 93, l. 1-10.  Mr. Leija later found a pair of his pants in the parking lot, and the wallet that had been in the pants was gone, and prior to the altercation those pants had been draped over a chair in the motel room.  Tr. p. 93, l. 14-25; p. 94, l. 1. The wallet had contained $180 and two or three credit cards. Tr. p. 94, l. 2-5. The police took Mr. Leija to the Marlow police department that evening where they had Petitioner and her co-defendant, and he identified them as the couple that had robbed him.  Tr. p. 100, l. 13-21; p. 107, l. 15-24.

Donny Foraker, a police officer with the City of Duncan, received a call at about 1:30 a.m. informing him of a possible strong-arm robbery at one of the motels in Duncan. Tr. p. 49, l. 14-19; p. 50, l. 6-21. Officer Foraker spoke to Mr. Leija to find out what had happened, and the department put out a broadcast with a brief description of the people involved. Tr. p. 51, l. 1-2, 8-12. After overhearing that description on the radio, the Marlow police department contacted the Duncan police department to say that two people matching that description had earlier been at the Marlow jail trying to bond someone out. Tr. p. 51, l. 12-16. The description was of a white male, 6' 2" to 6' 4", weighing 200-225 pounds, with short, blond hair; and a black female, 5' 8" to 5' 9", weighing approximately 175 pounds with short hair, gapped teeth, large breasts, and wearing dark pants with a dark green or dark black sweater-type shirt. Tr. p. 51, l. 23-25; p. 52, l. 1-5. Officer Foraker advised his office to contact the Marlow police department and ask them if they would let them know if the couple came back. Tr. p. 52, l. 8-12. In investigating the incident, Officer Foraker observed that Mr. Leija had an injury to his forehead. Tr. p. 53, l. 17-19. Officer Foraker was paged at about 3:00 a.m. that same day and was advised that the couple described had returned to the Marlow police department to attempt to bail out their friend. Tr. p. 56, l. 12-18. Mr. Leija was then taken to the Marlow police department to identify the couple, which he did. Tr. p. 107, l. 15-24.

After viewing this evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crimes of robbery with a weapon and conspiracy beyond a reasonable doubt. As to the elements of robbery with a weapon, Mr. Leija identified Petitioner as the woman who knocked on his door

claiming to need help, left to get her "friend," and who then reappeared only a moment later with her co-defendant. They did not ask for help, but Petitioner's "friend" instead struck Mr. Leija in the head with a metal tire tool. As he scuffled with the man, Mr. Leija heard the man yell "run, Babe," more than once to Petitioner, and Mr. Leija's pants that had been draped in a chair by the door before Petitioner came to his room were thereafter found in the parking lot without his wallet and money.

With regard to the elements of conspiracy, Petitioner and her co-defendant were identified as the couple who came to the Marlow police department to bond out their friend around midnight on September 7, 2001, only to learn that they did not have enough money to do so. They whispered something to their friend, and told the officer they would be back. As noted above, there was evidence that Petitioner and her co-defendant then robbed Mr. Leija. Less than an hour later, Petitioner and her co-defendant walked back into the Marlow police department, now having all of the money they needed to bond their friend out of jail. Taken in the light most favorable to the prosecution, this is sufficient evidence of an agreement between Petitioner and her co-defendant to commit a robbery in order to obtain the additional bond money they needed, and of several overt acts in the furtherance of that conspiracy, including Petitioner's ruse to lure Mr. Leija to his door in the middle of the night, her co-defendant/co-conspirator's assault of Mr. Leija with a weapon in order to rob him, the carrying away of Mr. Leija's pants containing his wallet, and the return to the Marlow jail with the wrongfully taken money in order to bond their friend out of jail.

Petitioner has not identified any governing legal rule from the Supreme Court's cases that was applicable here but not applied by the Oklahoma Court of Criminal Appeals. In making its findings regarding sufficiency of the evidence, the Oklahoma Court of Criminal Appeals cited Spuehler v. State, 709 P.2d 202, 203-04 (Okla. Crim. App.1985), which relied on the standard set forth in Jackson. Summary Opinion, p. 2 n. 1. Thus, it utilized the correct legal standard for analyzing a sufficiency of the evidence claim and properly applied that standard. Accordingly, it is recommended that relief be denied on ground one.

### B. Evidentiary Harpoon and Prosecutorial Misconduct

In her second ground for relief, Petitioner complains that Officer Aguilera injected an evidentiary harpoon during his testimony, and that the prosecutor then commented on this aspect of Officer Aguilera's testimony during closing argument. Specifically, Petitioner complains about the following testimony:

Q. Okay. And what did they do after they found out they didn't have enough money to bond him out?

A. As I said before, they spoke to Mr. Billings, who was incarcerated there. They told me they'd be back shortly with the rest of the money. And they whispered something in Mr. Billings' ear and then they turned around and walked out, and we went ahead and put Mr. Billings back in his cell.

Q. Okay. And after that did you have occasion to come into contact with them again?

A. Yes, Sir. I did.

Q. Okay. And approximately what time was that?

A. Well, at approximately 2:11 in the morning, my dispatcher, he has a scanner in the dispatch office and he listens to it pretty close in case Duncan - -

>   BY [CO-DEFENDANT'S COUNSEL]: Objection, Your Honor. I think that's hearsay.
>
>   BY THE COURT: Well again, it's - - it's more to explain the actions of the officer than as to the truth asserted.
>
>   You may proceed.
>
>   A. So what happened was the dispatcher - - let me back - - let me back up just a little bit. When they left, I advised our dispatcher to go ahead and contact the local stores that were open that late at night, because when he whispered something into Mr. Billings' ear, it kind of worried me a little bit. So - -
>
>   BY [PETITIONER'S COUNSEL]: Your Honor, I'm going to object. I don't think this is relevant.
>
>   BY THE COURT: That's - - that really doesn't. I'm going to ask that the jury disregard the same, but go ahead and proceed with - -
>
>   A. Yes, Sir.
>
>   BY THE COURT:  - - the answer to the question that was asked.

Tr. p. 72, l. 13-25; p. 73, l. 1-20. Then, during closing argument, the prosecutor made this statement:

>   If you remember what Officer Tony Aguilera told you. He told you he was there on duty in Marlow on September 7. That these two Defendants right here arrived at approximately midnight. Attempted to bond out Ralph Billings. They were twenty to thirty dollars short. So they left. Whispered something to Ralph Billings. He was suspicious at that time and he told you that. Told you that he put the convenient stores in that town on alert.
>
>   BY [PETITIONER'S COUNSEL]: Your Honor, I think that was - -
>
>   BY THE COURT: That was stricken from this jury's consideration, and the counsel or the jury should strike the statement made in Closing Argument.

Thank you.

Tr. 129, l. 15-25; p. 130, l. 1-2. On direct appeal, the Oklahoma Court of Criminal Appeals found the trial court's admonition to the jury to disregard any comments regarding Officer Aguilera's comments to have cured any error. Summary Opinion, p. 3.

"An 'evidentiary harpoon' is a metaphorical term of art that has been used by several state courts to describe the situation where a government witness, while testifying in a criminal case, deliberately offers inadmissible testimony with the purpose of prejudicing the defendant." United States v. Hooks, 780 F.2d 1526, 1535 n. 3 (10th Cir. 1986) (citations omitted). However, Petitioner's claim regarding the injection of otherwise inadmissible evidence through an "evidentiary harpoon" raises an issue of state law. Evidentiary errors generally involve only state law, and so do not generally support a claim for federal habeas relief. Bullock v. Carver, 297 F.3d 1036, 1055 (10th Cir. 2002) ("Generally speaking, a state court's misapplication of its own evidentiary rules . . . . is insufficient to grant habeas relief ."). On habeas review, this Court can only review state court evidentiary rulings "'to determine whether the error was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" Hooker v. Mullin, 293 F.3d 1232, 1238 (10th Cir. 2002), cert. denied, 537 U.S. 1165 (2003) (quoting Williamson v. Ward, 110 F.3d 1508, 1522 (10th Cir. 1997)). In other words, federal habeas relief does not lie for errors of state law absent a determination that the state court's finding was so arbitrary and capricious as to constitute an independent due process violation. Fields v. Gibson, 277 F.3d 1203, 1220 (10th Cir. 2002) (citing

Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Thus, Petitioner's burden is a heavy one; she must show that the state's failure to follow its own law is arbitrary in the constitutional sense, that is, it must shock the judicial conscience. Aycox v. Lytle, 196 F.3d 1174, 1180 (10th Cir.1999).

The undersigned finds that Petitioner has failed to sustain this burden in the present case. Officer Aguilera's comment regarding his own suspicions did not fatally infect the trial with unfairness given that Petitioner and her co-defendant were not charged with robbery of a convenience store in Marlow, that the dispatcher suspected that Petitioner and her husband might be the ones involved in the assault at the Hillcrest Motel in Duncan because of the rather unique description which was broadcast over the radio, and primarily, that the judge instructed the jury to disregard the improper statement. Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

With regard to the comment during closing argument, the Tenth Circuit has held that unless the comments of a prosecutor violate a specific constitutional right, the test for determining whether or not prosecutorial comments violate due process is that set forth by the Supreme Court in Donnelly v. DeChristoforo, 416 U.S. 637 (1974); Brecheen v. Reynolds, 41 F.3d 1343, 1355 (10th Cir. 1994); Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990). In Donnelly, the Supreme Court held that prosecutorial comments violate due process only when the prosecutor's conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637, 642-48 (1974). Under this test, it is not enough for Petitioner to show that

the remarks were undesirable or even universally condemned. Id. at 642-43. Rather, the relevant question is whether the remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process. Darden v. Wainwright, 477 U.S. 168, 181 (1986). To establish that a prosecutor's remarks were so inflammatory that they prejudiced the substantial rights of Petitioner, Petitioner must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, a conviction probably would not have occurred. See Thomas v. Cowley, No. 90-6105, 1991 WL 151773 (10th Cir. Aug. 8, 1991). Here, the prosecutor's alleged misconduct was certainly not persistent or pronounced. Moreover, the evidence was not so insubstantial that absent the prosecutor's reference to Officer Aguilera's self-proclaimed suspicions, there probably would not have been a conviction. The jury was presented with the very same evidence that initially aroused Officer Aguilera's suspicions, and so omission of his testimony on that point would have made little if any difference. Accordingly, it is recommended that relief be denied on ground two of the amended petition.

**C.  Cumulative Error**

Finally, Petitioner claims that her convictions should have been reversed due to the cumulative impact of the errors that occurred at trial. In considering this claim on direct appeal, the Oklahoma Court of Criminal Appeals stated that "we find [Petitioner] was not denied a fair trial by cumulative error." Summary Opinion, p. 3.

"A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their

cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir. 1998). To count, each error must involve a violation of the federal constitution rather than state law. See Parker v. Scott, 394 F.3d 1302, 1327 (10th Cir. 2005) ("Because we find no single constitutional error, we also must reject Parker's argument that cumulative error resulted."); Hain v. Gibson, 287 F.3d 1224, 1244 (10th Cir. 2002) ("Although Hain has asserted a cumulative error argument, it is without merit since he has failed to identify multiple constitutional violations arising at trial." (citation omitted)); Neill v. Gibson, 278 F.3d 1044, 1063 (10th Cir. 2001) ("Because there was no constitutional error, Neill has also failed to establish any cumulative error warranting habeas relief." (citations omitted)). "'Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors.'" Moore v. Gibson, 195 F.3d 1152, 1175 (10th Cir. 1999) (citation omitted). Petitioner has not shown one, much less two or more constitutional errors. Thus, it is recommended that habeas relief be denied on ground three.

Finally, the undersigned notes that Petitioner has requested an evidentiary hearing. The AEDPA restricts the Court's ability to grant evidentiary hearings to certain limited circumstances. Section 2254(e)(2) provides that "[i]f the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant" can satisfy one of the two exceptions listed in § 2254(e)(2)(A) and (B). First, a habeas petitioner must show that the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral

17

review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(i)-(ii); Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000). Second, a petitioner must show that the facts underlying his claim would "establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). If, however, the habeas petitioner did not fail to develop the factual basis of a claim in State court, then § 2254(e)(2) is not applicable and the Court must analyze whether a hearing is appropriate or required under the pre-AEDPA standard. Bryan v. Mullin, 335 F.3d 1207, 1214 (10th Cir. 2003) (en banc), cert. denied 541 U.S. 1096 (2004). Here, Respondent concedes that the factual basis for Petitioner's claims herein was adequately developed in state court, and that the pre-AEDPA standard applies.

Under that standard, Petitioner is entitled to an evidentiary hearing only if "his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998) (quoting Medina v. Barnes, 71 F.3d 363, 368-69 (10th Cir. 1995)). See also Trice v. Ward, 196 F.3d 1151, 1159 (10th Cir. 1999) (petitioner not entitled to evidentiary hearing under pre-AEDPA standard because his ineffective assistance of counsel claim could be fully resolved on the record before the court). As discussed above, Petitioner's present claims are invalid even if all of her factual allegations were true. Accordingly, the existing record is sufficient, and an evidentiary hearing would not be necessary even under the pre-AEDPA standard. See Fox v. Ward, 200 F.3d 1286, 1302 (10th Cir. 2000) (affirming

18

the denial of an evidentiary hearing when the petitioner did not "make allegations which, if proved, would entitle him to relief"). Accordingly, Petitioner has failed to show entitlement to an evidentiary hearing with regard to the claims raised herein.

### RECOMMENDATION

For these reasons, it is the recommendation of the undersigned Magistrate Judge that the petition for a writ of habeas corpus be denied. Petitioner is advised of her right to file objections to this Report and Recommendation with the Clerk of this Court by July 13, 2005, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. Petitioner is further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. Moore v. United States, 950 F.2d 656 (10th Cir. 1991). This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

**ENTERED this 23rd day of June, 2005.**

_____
DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE